Thank you. Ben Coleman for Appellant James Wells. I was just going to go through the issues in the order that the court had outlined in its order last week, so I will start with the testimony of Ms. Belisle, and with that issue I'll start with the standard of review because there's a dispute there. It's our position that the objections at trial were sufficient, but even if they weren't sufficient, the government violated Rule 404B, its notice requirement, by failing to provide any pretrial notice and essentially sandbagged with this evidence and that the government, whether you look at it as a waiver or unclean hands or however you want to look at it, the government shouldn't be allowed to violate the rule, which is designed to allow pretrial litigation on these issues because this type of evidence can be so prejudicial and to allow counsel the full and complete time to make all the relevant arguments as to why this type of prejudice. I want to focus on this testimony for a moment. I take it your real objection in this case is to the answer that the witness gave when she was asked, and how did you feel when Mr. Wells said good day to you or hello to you, right? There's nothing else in this testimony that could cause you any prejudice. Correct. Not when that answer came out, which I think is probably objectionable. No objection is made, correct? Correct. It's about one or two questions later. But the objection that's made one or two questions later seems to me, as I read the record, to go to further exploring when Mr. Wells normally voted and when the witness was normally at the polling place. Wasn't there a question or two later that said, Your Honor, this is all irrelevant, it should be stricken, or I requested instruction, or anything like that. Is that a fair summary of what happened? That is, but obviously I'd like to put a little context into it, which is that the defense was completely sandbagged. She didn't testify as to this at the first trial, although the defense filed a pretrial motion saying, look, in the prior appeal, this court found that the government engaged in misconduct with respect to her opinion as to who was the murderer in the case. The defense filed a pretrial motion saying, look, no more funny stuff with her testimony. We don't want you to do that again. You can tell from the pleadings that the government is sandbagging with this evidence. So if the defense is caught off guard, I think that's the point I was trying to make, is that the government had an obligation under Rule 404B to give pretrial notice. It's clear, I think, that defense counsel, they may be a question or two late, but they know something is wrong with this testimony. They know that the testimony really hurts, and they're trying to figure out on the fly what should happen here. They make the objections, and yes, if they're a question or two late, and perhaps did not get to the nub of the issue, the fault is the government's. I mean, this court, in the last appeal, it also criticized the government for failing to bring something like this up before the witness testifies. So to fault the defense and to say that the objections weren't sufficient when the government violated the rule, Rule 404B, we think that that's unfair. We essentially think the government has waived any claim that the objections were insufficient. Well, they haven't waived it. Waiver is a theory where somebody says, I don't claim to assert something. I think, taking your argument, by their conduct, they ought to be stopped from making this argument. But certainly, as waiver is understood, they haven't said, oh, we waived that argument. We intentionally don't want to make it. Well, whether it's estoppel or forfeiture or unclean hands, whatever the theory may be, I don't think the government should be allowed to violate the notice requirements that are specifically set forth in the rule, and then claim, well, the defense should have done a better job when we sandbagged. I mean, then the incentive is for the government just to sandbag. Let's just sandbag and see if they miss it or they don't get the objections right. What is the incentive for the government to comply? Might as well sandbag and hope that the defense, they're not quick enough on their feet. And this defense counsel knew there was something wrong and objective. But in any event, it's plain error, even if you want to say plain error applies. I mean, there is no logical inference that Mr. Wells was engaging in witness tampering or intimidation in this scenario. This is essentially admission of her opinion that he is the murderer, because the only reason why she would become terrified and freak out with him saying hello while he's voting is because she thinks he's the murderer. And I know it's not on the agenda, some of these other issues, but this is a common theme in the case, is let's get these opinions in that Mr. Wells is lying, that he can only be the only possible suspect, that we all know that he's the murderer. This is like the strategy in the case, rather than, you know, because there's so much dispute in the evidence, let's get in all these improper opinions that he's guilty, that everybody thinks that he's guilty. And it's a theme in the case, and that's why the government did it, and that's why they sandbagged. And I'm shocked that they did so when, in the prior appeal, this court criticized and found misconduct, a very similar type of conduct related to Ms. Blile's opinion. Well, it was, I think, somewhat different. The government sought an opinion about who the murderer was. Here, they sought, I guess, her reaction to seeing Mr. Wells. I'm not... Which conveys the exact same opinion. I want to start by saying that, and I want to give the government a fair chance to respond to that. I'm not sure it shows anything, but it is of a different quality than asking a witness who she thinks committed the murder. But it had the same effect, which is that... That's my next question. How do I know that? Let's assume there's no other errors in this trial, just for purposes of discussion. That on every other point on appeal, the government's right. Would this be a reversible error in and of itself? Well, it's our position that it is. This is a closed case. I know the government says it's overwhelming, but, you know, on a very similar record, this court said it was an overwhelming last time, and found harmful error and reversed the trial error. And the emotional impact of this evidence... I mean, the government says, oh, well, it was at the beginning of the trial. Well, yeah, it set the tone. This is the victim's wife, gets on the stand in tears. I think you can tell from the testimony that I think there are periods where she's sobbing. In tears, is testifying that Mr. Wells, he, you know, tormented her. And, you know, the government spent a lot of time trying to draw out this emotional impact. They did it in violation of pretrial orders, you know, through Ms. Belisle's testimony. The very first thing in closing arguments is they went to Ms. Belisle and brought out this emotional impact and about how the last couple of hours that Mr. Belisle had with Ms. Belisle. That was the very first thing they did in closing arguments. They didn't revert to this testimony in closing argument, did they? No, they didn't. But this was the emotional hook that they were looking for from the very beginning of the case. And so the government says, oh, what happened at the beginning of the case? Yeah, that made it even more prejudicial. I know you want to move on to other topics. I just wanted to ask you one other question. You're not making a sufficiency of the evidence argument on appeal, correct? I did not. I did not raise it. Okay. But I think the evidence was extraordinarily close. I don't mean, because I didn't raise it. That's a separate issue. There was one raised in the first appeal. And I just want to make sure I have that. That's correct. You are correct. It was raised in the first appeal. I did not raise it in this. And the court had rejected that in the first. This court had rejected that. The second issue on the agenda would be the Garrity issue. And our position is that this court has set forth an objective test to determine whether there is a Garrity violation. In this case, we have a policy that we believe clearly indicates that a refusal to cooperate in an investigation can lead to adverse employment consequences, including termination. And on that objective standard, a Garrity warning was required, and it's conceded that no Garrity warning was given. For that reason alone, our position is that the statement should have been suppressed. And we think when you add that error onto the first error, you start to talk about accumulating the prejudice, that even if the court didn't think the first error on its own required reversal, when you combine it with this error, there is certainly cumulative prejudice. On this, just so I make sure I'm following your argument here, I take you to be saying there was not coercion to implicate himself in the conversations themselves, but there was a background policy, this manual, and that is doing the work here? Is that your position? Yes, if I understand your question, I agree there was no explicit threat. Nobody said to him, if you don't talk, we're going to fire you, or something like that. It's an implicit, this is a policy that exists, it's there, and it says you have to cooperate in the investigations. Now, I think under the circumstances, everybody understood you have to cooperate. They were locked there, detained until 9.30 at night, long past, I think six and a half hours past the end of their normal work day, to sit there and wait to be questioned and interviewed. So everybody knew they were under an order to participate in the interviews, but we also have this... Would the position be that really all the employees should have been provided this warning given the manual? Absolutely. Everybody who went in there should have been told, we set forth the DOJ standard guarantee waiver language that they have. I mean, this is part of DOJ policy, is that you are supposed to give the guarantee waiver. So we're just asking the court to follow what the Department of Justice has already implemented, which is give all these people guarantee waivers when there is an employment policy that says you have to cooperate or else face adverse employment consequences. Can I go back, the policy you rely on is the manual, the Coast Guard manual? Correct. And what language in it specifically do you rely on? In other words, there's language in it that says you should cooperate in all investigations. Right. What's the language in it that leads you to think that employees should be aware of the adverse consequences of failure to do so? Well, we quoted them in the briefs, and let me try to pick them up, but before I actually read the exact language, you are correct, the cooperate language, there's also answer, you have to answer all questions language in there, and the case law says that those words, cooperate and answer, those types of language does create an obligation to answer, but let me... What case law are you referring to? Well, I'm referring to Goodpaster, which I know is not binding on this court, it's a district court decision. I also believe Sascio, which is a Ninth Circuit decision, talked about answer, using answer language. What about Aguilera, though? Yeah, Aguilera is a case where there was no... They never used the statements in a criminal proceeding, so there was no violation. Aguilera is a civil rights case under qualified immunity, on a qualified immunity standard, where there was no use of the statements in a criminal prosecution. Those officers in Aguilera were never prosecuted. So the case that governs here, Sascio, I don't know if I'm pronouncing that correctly, but that's the Ninth Circuit criminal case. Let me just get Judge Hurwitz... I'm putting aside for a moment the caution letter, which seems to me to deal with an entirely different transaction. In other words, he was not being asked during these questionings about his use of the credit card. So I'm just trying to focus on the manual for the moment. Okay, let me focus on the manual and then... It says for failing or refusing to give oral or written statements, or to cooperate in connection with anything. Right. It says failure... Does that suggest there's an adverse employment consequence? Yes, you can be... Yes, you can be... The penalty range is anywhere from written reprimand to suspension or even removal from office for, quote, failing or refusing to give oral or written statements or testimony or cooperate otherwise in connection with any official inquiry, investigation, or proceeding. And that's about... That's what I'm looking for. Maybe I've overlooked it. The language that I have says it's an offense for failing to do those things. Does it say... And it may be a federal offense. I don't know. But is there... Does it suggest there will be employment consequences? Yes. If you look at that... It's part of the table in the manual. If you look at the table, there is a column which sets forth the potential penalties for violating that provision. I've got you. And the penalties, okay, they range anywhere from written reprimand to actual removal, actual termination. So, I mean, this language is even clearer than, you know, the language in other cases where they found, you know, an implicit, you know, a potential penalty situation So, we think... That takes me to the question I wanted to ask before. Now that I've got the record straight online. You're not contending that in this case Mr. Wells was operating under the assumption that he could remain silent, but he shouldn't because he'd lose his job. You're just saying that because these policies are out there, the guarantee warnings have to be given. Well, we think we can satisfy both. Our position... I don't see anything in this record where Mr. Wells says, gee, I wouldn't have told him anything, but I was afraid I was going to lose my job. There's nothing here that shows that he has subjective knowledge of the consequences of not answering. You're just saying that because the policies are out there, guarantee applies. And I'm not sure that's wrong. I'm just asking. In that, yes, our first argument is it's just an objective analysis. The policy is there. We don't have to get into what you're saying right now where he would say, the only reason why I spoke is because I thought I was going to be fired. We do believe that if the court disagrees with that and you don't think it's just an objective analysis, that we think you can infer, while we don't have the testimony that Your Honor referenced, we think you can infer that he knew that he was under an obligation to speak. When you factor in the letter that he received just a few weeks beforehand, yes, it was focused on the charge card, but it also said any other misconduct. And you may be out. You're going to be subject to penalties. It didn't just say anything related to the charge card will subject you to penalties. It said any other misconduct. And he knew he was under an order to participate in these interviews, and he was told that he had to remain there for as long as they wanted. So we think you can infer if a subjective inquiry is required, but we don't think a subjective inquiry is part of the analysis. What in the manual would suggest he was required to waive his Fifth Amendment rights? I mean, that seems to be it's one thing to have to cooperate in an investigation,  implicate yourself in something. I'm not sure the manual requires the latter. Well, no, the manual may not require that you waive your Fifth Amendment rights, but let's say you come in and you say, I'm not talking. Well, then you can be fired. That's the problem. I mean, they can't say, no, you have to talk. They can't say, you know, they can't hold a gun to your head and say... Is there anything in the record that suggests that that's how the Coast Guard has applied this policy? No, but that's what the policy says. Other than the plain language of the policy, which is that you can be subject to reprimand or even removal or suspension or all these different penalties if you don't cooperate. And that's, you know, that was the same thing at Goodpaster. It was a postal, you know, the U.S. Post Office, their policy, and there was no evidence in the record that any postal employee had ever been fired for, you know, not cooperating. But, you know, Judge Simon in that case found that suppression was warranted because there was no objective evidence of the postal policy, the postal service policy. I know I'm running out here. I just was going to hit the video of this very quickly, and then I'll stop. On the video, one of the crucial points I wanted to make is that the government says that we haven't cited any authority to support our position, but we've cited W.R. Grace, which is a Ninth Circuit case, and W.R. Grace recognizes that a district court commits error when it applies Rule 403 balancing test rather than the Rule 703 balancing test. And those two tests are dramatically different. It's a completely inverted test. The government, under Rule 703 balancing, they have to show that the probative value substantially outweighs the prejudicial effect, whereas the Rule 403 test is exactly the opposite. Was this preserved? Well, the defense vigorously objected to the introduction of the video in any form, and we think their objections were sufficient to preserve the issue. I see I'm running out of time. Why don't you stop now? We'll give you some time for rebuttal because we've used up a lot of your time with our questions. And we'll hear from the government. Thank you, Your Honor. May it please the Court, Dan Lerman for the United States. I think I'll start with Ms. Belisle's testimony and then move on to the Garrity issue. Judge Hurwitz, you're correct that there was no objection to her testimony. That is that issue here. There was an objection three or four questions later that all related to the timing of when Mr. Wells normally voted. Well, put aside the standard of review for a second. I'll come back to that. I've been thinking about this case for a long time now, I guess, and maybe not as long as my colleagues, and I'm having a real difficult time figuring out why this testimony is relevant. What difference does it make? He approaches the witness and says something I think that's perfectly appropriate. How are you this morning? She doesn't contend that he does it in a sneering manner or a personally threatening manner. And she says, when he said that, I was terrified and scared. How is that relevant to the issues in the case? I think there are a few reasons why it's relevant, Your Honor. First of all, she did testify to more than that. She testified that the polling place opens at 7 and that he was there at 6.45 a.m., essentially waiting for her before it opened. He testified that he approached her directly at the polling place. This isn't somebody, they don't have a preexisting relationship. They hadn't talked. He approaches her directly. He's, quote, smiling and grinning and comes up to her and grinning. I'm sorry, Your Honor. That is odd behavior by somebody who has been accused of murdering your husband. And everybody knows that he's been accused. You have no preexisting relationship. This is not a chance encounter. He goes up to her directly, talks to her, and confronts her in front of everybody. This might not be highly probative, and that's what Your Honor is. What is it probative of? It's probative of consciousness of guilt, Your Honor. I do want to back up, though, and just say that. Why, though? Because he's been parcel of his odd behavior where he's trying to, you know, behave in a manner after the murders that looks innocent, but in fact is extremely inculpatory. His behavior in the immediate aftermath of the murders where he's falling asleep and his ears are ringing and he's ringing a book and he's barging to offices and he's talking about the alibi, he's consistently been trying to sort of be out there and be present and show his innocence. Let's assume all that for a moment. Judge Thomas, forgive me. Let's assume that his behavior is relevant somehow. Why is her reaction to his behavior? That's what they're objecting to. They're objecting to the witness saying, and when he did this, I was scared and terrified. Why is her reaction to his odd behavior relevant? Let me just, though, back up and just say that. I think Your Honor's questions are, to a certain extent, going to a traditional 403 balancing. Our position is that this is not 404B evidence at all. It would still, of course, be subject to 402's relevance. Whether it's 404B evidence or 402 evidence, we still have to look. And it seems to me that's what they're complaining about. They're complaining about the answer, not the question of did you see him that day and did he say hello. The prosecutor said to him, and what was your reaction to her? That's right. In our view, that's part of setting the scene. Your Honor asked what was there here that was out of the ordinary or reflected consciousness of guilt. Our view is that's part of setting the scene. Part of his behavior is her reaction to the behavior and how she saw it. The judge and the court and the jurors weren't there to see everything. She was testifying as to how she perceived the incident. So it is relevant to that, and it is consciousness of guilt. We understand that that could, to a certain extent, then lead to an inference of guilt, but that's what consciousness of guilt evidence always does. No, I had the same question. In our view, it's... I'm sorry, Your Honor. No, I just really don't understand the relevance of these questions. They're asking what time of day is he... I would just add that... What time or another he shows up to the... Well, the time of day, yeah. That's a different... There was a foundation objection, and the time of day then went to the foundation and how she knew this was unusual and the fact that he was there 15 minutes before they even opened. There was a lengthy sidebar on this, on the timing, and he did not once utter the words prejudice. He did not once utter the words 403, even with respect to the objection that he did make. So to the extent that Your Honor is concerned with her reaction, which does seem to be their primary concern on appeal, I agree. The rest of it makes any difference. None of the rest of it... Right. He showed up to vote and he said hello. I mean, that... Yeah. You wouldn't have put that into evidence except that you wanted to get her reaction, correct? He was part and parcel of setting the context for his behavior. The behavior was they haven't seen each other in the six or so months or whatever. They had no preexisting relationship. This is not a chance encounter. Well, they knew each other. Well, yeah, they did know each other, but I'm talking about... So they had a preexisting relationship? Sorry, sorry, they did not... Yeah, that's true. They knew each other before the murder. Sorry, I misspoke. But since the murders, there was no other evidence of them interacting in this manner. And so she felt, and she testified to that, that he was essentially coming up to her, you know, purposefully in a way that was not a chance encounter and in a manner that she believed was threatening. But as Your Honor suggested, this was not mentioned in closing argument. This was never adverted to. This was not a major part of the prosecution's case. Your Honor is correct that this is a totally different issue than what came up in the first trial, which was a prosecutor must condemn a claim. And I'll note that the court found that it was not prejudicial in the first trial. It did not find that that was reversible error. It found a totally different error that was reversible. And that was a case that was a totally different... You didn't say it wasn't reversible error. The court said that it was on the prong of prejudice. It found that it was not prejudicial. It did say it was not reversible error. The reversible error had to do with admitting the profile evidence of guilt. The profile evidence. Which is a totally different thing. And it found that evidence, that error was reversible. It did not find that the other error was reversible. And it's a totally different error. And it's a totally different trial at which Mr. Wells did not take the stand. We believe that the evidence of guilt here is overwhelming. There is the timeline where you have him... You don't have to convince us. If you have to convince us that the evidence of guilt is overwhelming, you've got a difficult case. The evidence of guilt was sufficient to go to the jury. Because your friend doesn't contest that. But one has to make a bunch of inferences to find guilt on this record. I think those inferences are permissible. But it's certainly not an overwhelming case. I would push back a little, Your Honor, and suggest that Mr. Wells' own testimony, which was inherently incredible, that came up with utterly implausible explanations for his whereabouts. I'm just going to ask you, if Mr. Wells had never answered any questions, had never testified or answered any questions to the investigators, this case would be pretty weak, would it not? Oh, no, Your Honor. I mean, if you're turning it to the Garrity question, and we can't turn it... Are you talking about his testimony, or his... Let's go back to the Garrity issue for a second. The question is what he tells the investigators. No, I don't think so, Your Honor. What he tells the investigators seems incredible. What he testifies on the stand at the first trial seems incredible. I'm saying the absence of his bizarre descriptions of what he was doing that day, this is a pretty thin case, isn't it? I disagree with two clarifications. He didn't testify in the first trial, and it's not what he told the investigators that is so bizarre. It's what he testified to at the second trial that is bizarre. But it's his... I was doing this, and the tire wasn't, and I didn't go there, and I had to go to the bathroom, and all that stuff that makes him look quite guilty. What I'm saying is in the absence of that, the evidence is not all that strong, is it? I mean, I would disagree. I do think that is highly probative of guilt, as we state in the briefs. I think there is clear evidence here. I mean, we have a timeline that puts him there at the exact time coming and going. He was captured on film. We then have the blue car, that is consistent with his wife's car, that was shown to have been moved while she was away, that had his mail placed on the front seat that was there when it wasn't, that other suspects were excluded, that they have the videos of the car, and you have multiple experts testifying without regard to the reenactment video that it was consistent with her car. You have the ammunition found in his house. You have his erratic behavior. You have his motive, and you have that coupled with he had no contemporaneous plausible explanation, but then he came up with this utterly implausible explanation. So we submit that there is abundant evidence of guilt here, and we could tie this into the Garrity. And so I take it your argument on this testimony by the wife is that it didn't likely affect the verdict. Yes, by no stretch of the imagination. I mean, we obviously believe that this is the plain-error standard, and it was his burden to show prejudice, and he didn't even attempt to do so. But under any standard, it's not probable to have affected the verdict. There is abundant other evidence. There was no use of this particular evidence at closing. This was a single statement that he himself said was innocuous, and it was not part, and I would disagree with my friend, it was not part of any sort of larger conspiracy in this case. It was a single statement on day three of the trial that was never turned back to and was never spoken of again. Can you respond on the manual on the Garrity issue? On the manual, the first threshold point is that he never said that he even saw the manual. Now, this is separate from the subjective argument that Your Honor, Judge Hurwitz was suggesting that he didn't say that he was under impression, even aside from any subjective belief. He did not argue below, and he did not argue on appeal, and he did not argue today that he even saw the manual. So what if the manual said you may not assert your Fifth Amendment privilege when you're being questioned, and if you do, you'll be fired? You're saying if it said that. If it said. This is a hypothetical. Oh, yeah, yeah. Would Garrity be invoked, even if he didn't know what the manual said? I would say no, and that this is not this case. The reason why it's no is that I know. So tell me why the answer is no. Why no is because it can't be a secret threat. The core of Garrity is coercion to testify, and Saccio, the probationer, was told you need to answer these questions. The inference was, you know, you could be sacked for doing so. You don't need to be explicit by saying you need to invoke your Fifth Amendment, you know, waive your Fifth Amendment right, but there needs to be an actual threat communicated that led to a reasonable inference. In Saccio, there was a threat. In Goodpaster, the district court case that he relies on, the defendant testified that he knew of the applicable regulations. So if there's a secret regulation that said what Your Honor said, it would not be sufficient to show. Well, not a secret, but assuming that hypothetical, if that's what the manual says, we have to have a trial now to see if every employee got a copy of the manual and read that page of the manual and understood the manual. No, it's not every employee. It's whether he, if he even said I was aware of this manual. I'm talking about in Garrity's situations. Is that what you're saying Garrity calls for? Yeah, in Garrity itself, he was not only told you need to answer questions, he was told you need to waive your right, and if you don't do so, you need to be fired. None of that is the case here, and Aguilera, which I do want to get to because I want to get to the case, was forced and coerced to testify and cooperate. That is not tantamount to a coercion to waive your Fifth Amendment privilege. Aguilera is not a qualified immunity case. It is a Section 1983 case that did not get to qualified immunity because the threshold question was whether or not there was a Fifth Amendment right under Garrity, and what the court held is we hold that the supervisors did not violate the rights when there were questions about possible misconduct. Even though they were coerced into questions and even though they were coerced to answer, because they were not compelled to waive their Fifth Amendment. Just to be clear on your position on these kind of manuals, if there were hypothetically a manual that clearly requires somebody to violate their Fifth Amendment right on pain of losing their job, your position is even then, he has to come forward with something to show that this, that he was either aware of the manual or perhaps aware of a culture created by the manual or something that connects what this manual says to what he believes knows or does. Is that fair? I do think that's what every court of appeals to address the question has said. Now, I don't think this court needs to reach that question for the reasons we stated in the brief because there was nothing even approaching coercion to waive your Fifth Amendment rights. But there's a First Circuit test which says you need to be explicitly told to answer the questions or be fired. That is undisputed. It's not the case here. And the First Circuit has a subjective... No, that's a different test. There's a subjective... Well, that is subjective, I think. So that is almost an entirely subjective test. Under certain circumstances, it has to be a reasonable person. Right. Well, that's the other test is that there needs to be a subjective belief that you'll be fired and that belief needs to be reasonable at the time the statement is made. So, first of all, you don't have a subjective belief if you aren't even subjectively aware. So that has two steps that aren't present here. Subjective belief that you're going to be fired and, of course, knowledge of the regulation that you then have the subjective belief. That's what I want to focus on for a second. So, again, you don't have to tell me this is not this case because it's not. I understand. Assume the manual says the worst thing in the world. Dutch Thomas could probably make up a better one than I. But it says you have no Fifth Amendment rights when you deal with our agency and if you fail to answer any questions exposed to you, you will be fired, et cetera. Your view is that as long as the witness doesn't have a subjective awareness of that policy, there's no garrity obligation. Violation. Right. The obligation of garrity is to that violation. Sure. Because I'm assuming that there's no warning is given. Yes. I mean, again, the core of garrity is coercion and it needs to be coercion you're worried about. I'm not going to say that this is the words that this is not this case, but that is the core of garrity. That is what every court of appeals has required. The point is that you are threatened to testify or lose your job. And our position is that if you don't have a subjective awareness, much less a subjective belief, then you were not threatened to court. And I would just add in this particular case, Your Honor, he did not have such a belief. He did refuse to answer inculpatory questions about his workplace disputes before he terminated questioning. He then, of course, as we know, he was given his Miranda rights. He was expressly told he didn't have to answer questions. Our view is that it would be unreasonable for somebody who's told you don't have to speak to believe that he did have to speak and would lose his job if he refused to do so. And then he went to terminate the interview. So there's three bits of evidence here that shows that he had no such belief. He, in fact, declined to answer questions and said, I'm not going to answer that because it was inculpatory. Can you deal with the letter about the credit card use? I do think there's evidence that he was aware that he'd received the letter and read it. It speaks of some obligation of cooperation. Would you address that? Sure, Your Honor. I don't, it just simply said that he would be disciplined for future misconduct. It said nothing about obligations to cooperate in interviews. It said nothing about speaking in interviews. It said nothing about waiving your Fifth Amendment immunity. It just said, we're putting on your, you know, you've got to stop doing this. You know, you're on thin ice here. It didn't make a finding with respect to misuse of the credit card because they didn't have them on video stealing the card. But it said, just so you know, and we're going to take any future misconduct seriously. It said nothing, there's no reasonable person would interpret this as having anything to do with interrogations, much less waiving your immunity. And I suppose the argument is the manual says it is misconduct not to cooperate. And so, you can put the two together, but there's, but I take your point. Yeah, I don't understand. The manual is the manual and if it's misconduct under the manual, that's their argument. I don't really see what the fuel letter adds. I would say this court relied on the Aguilera decision, by the way, in its earlier decision in this case. It relied on the principle there was a Fourth Amendment seizure argument. This court applied it as a straightforward constitutional holding and said that even though they were forced to be there and remain in their employees subject to discipline, they were not seized within the meaning of the Fourth Amendment. They were not, their Miranda rights were not violated. This court already addressed Aguilera in that context. Murphy, the Supreme Court case, talks about cooperation and says mere cooperation to testify is not tantamount to a garrity violation. We require people to come to court and testify all the time. The requirement to cooperate and testify and give truthful answers is not a garrity violation. That's what this court held in Aguilera where the court even addressed coercion to answer and it's what the court addressed in Murphy. Mr. Coleman may have made some suggestion that under DOJ guidance or policy, and I may be misinterpreting what he was saying, but that this should have been given as a matter, a garrity warning should have been given as a matter of DOJ guidance or policy. Is that true? I don't think so, Your Honor. I think what he's talking about is some of the Goodpaster case talks about an OIG procedure that when the, sorry, the Department of Justice Office of Internal Investigations has made a suggestion that when you are interviewing your own DOJ employees it may often be prudent to do this. It didn't say it was required. It said the reason to do this is to prevent the risk that we're at right now which is that then there's going to be litigation about whether statements were made voluntarily or not. But there's no requirement. The DOJ didn't say when the FBI gives interviews it has to do this. It didn't say that when the Coast Guard takes statements it has to do this. This is a run-of-the-mind criminal investigation of a murder. He was aware of his right to remain silent. He invoked his right to remain silent. He invoked his right to refuse to answer questions. And it was not contrary to any DOJ or government policy. Let me ask you about the video. I mean, the one odd thing about the video here is that there already was a video. That's right. So it's not like a reenactment of a thing that we're trying to help the jury understand as like a demonstrative. Here, the video exists. It's just of, you know, not the greatest quality. So does the way we approach this question differ somewhat when we already have a video? No, Your Honor. I mean, no, for two reasons. First, so the threshold question which was posed to the court by defense counsel himself was to ask whether it was substantially similar. So that assumes sort of, like, you know, by hypothesis that there are two videos. The court found that it was substantially similar, made that factual finding. He never disputed that it was substantially similar on appeal. And so that is, you know, the fact that there are two videos is relevant to show that it met the substantially similar test which is what courts hold is required for admissibility including the defendant here. I gather part of Your Honor's question is sort of another sort of 403 type question which is why is this relevant? And, you know, we think it's, and again, and I think you asked the question, there was no express 703 objection made at any point include, either before trial or even when the experts were testifying. And I'm going to get into the Casey sites in a minute if I have the time. But the relevance here was that it assists the jury in following the testimony. It let the jury see what experts and the investigating agent saw. It allows the jury to see what a known car looks like on the screen and how much difference there would be, you know, on this CCD camera versus... Were there dapper challenges to the experts? I'm not raised here that... Not raised here, no, no, Your Honor. And again, so it is relevant because it aids the jury. It lets them see what everybody shows. It helped the jury understand the testimony trial and any differences on the videos. And this is part of the substantially similar test, goes to the weight of the evidence, not its invisibility. And on the flip side of the coin, any error would have been harmless. And this is, Your Honor was sort of intimating about this, but we have multiple experts who testified largely without respect to the April 19th, the recreation video, that based upon the April 12th video alone, they believe that the car in that video, this was the suspect video, was consistent with Mrs. Wells' car. You have Mr. Schmidt, the Honda engineer, testifying that he has 70% certainty that they're the same vehicle. He did not mention the video and in fact, when asked, said that it did not factor into his decisions. Mr. Becker said that without respect to that later video, based on the 12th video alone, he was able to narrow down the cars to two types of cars, an Isuzu Rodeo and a Honda CRV. And you had Mr. Toglia who superimposed a 3D image of the Honda onto the 12th video. So to the extent that it was used, it was used minimally. It was so that the jury could follow along and it was used for a very minor point, which is that these were broadly similar vehicles in size or shape, which is something that the jury can infer on its own, but it can infer it only when it sees the two videos. But that's hardly the type of prejudicial evidence and there was, as I said, there was other evidence too that the CRV was used in the murders. We've taken you over so let me make sure neither of my colleagues have other questions. Can I just make one point about the Grace case, which is... You may, quickly. The Grace case is a case in which the district court found evidence inadmissible under Rule 403 and said that the district court erred in not determining whether it was nevertheless admissible under 703. So the court held that even though the evidence was not admissible under 403, it could still be admitted under 703 and the district court erred because under 703 you could present it to the jury without admitting it. Here the court took abundant precautionary measures to minimize any risk of prejudice and so that case is inapposite here. There was no 703 objection made. There was no prejudice objection made in that context so this whole burden shifting thing is not supported by the case law. Thank you.     in the prior appeal, this court did not reverse based on the fact that Ms. Belisle did not reverse based on the fact that Ms. Belisle did not reverse based on the misconduct related to her testimony because of two reasons. One, the district court gave a very strong curative instruction as to the government's misconduct and number two, the parties then stipulated to the admission of the transcript of what she said when she was notified of the murder so that the misconduct     with the objection issue here and why I raised it. Had Ms. Belisle not reversed based on the fact that Ms. Belisle did not reverse based on the misconduct counsel objected at the time. We don't know what kind of instruction the district court might have given with respect to the witness's response to how she felt when she saw Mr. Wells and so, you know, I know you make an argument that the government is sandbagging but part of the problem with plain error objections it seems to me is that we have the same problem on the defense side. The problem might well have been cured if somebody raises an objection, contemporaneous objection to what she said Well, the court when they did object and go up the sidebar the court specifically said I see no 403 problems here. I mean, the court I mean, the court addressed 403 and said let's go. I'm not and the government because they got what they needed they're like we'll get out of here now. We won't ask any more questions. That's what they did. So, and yeah, I mean, if you get sandbagged it's always hard to come up with on the fly the exact objections. I mean, these attorneys objected as best they could on the fly which they weren't supposed to. Can you respond to the government's argument that whether relevant or not this testimony was not being offered as 404B evidence of prior bad conduct but rather as evidence of consciousness of guilt? Right. And it is well, it's both. It's 404B evidence that shows consciousness of guilt. Even the case that they cite Well, but is it a prior bad act? See, I'm having difficulty reading this as a prior bad act. I know he went up to this person and said, hello. It's only her reaction that you object to not his act, correct? Well, I mean, we, yeah, we don't think they proved the prior bad act. We don't think they proved that he had any intent to intimidate her or that he did intimidate her. So, I mean, we've argued that. That this was, their theory is a 404B theory. Their theory is he engaged in witness intimidation which this court in Begay and in Bank Opinion, Melling, which is another case we cited and several others has said is 404B evidence. 404B governs this type of evidence. They just didn't prove that he committed the act. We agree with you. But even if they somehow did prove it, it should have been excluded under 403 because it's just her opinion that he's guilty and nothing else. I mean, they're using, their theory of consciousness of guilt is based on a 404B analysis. This is an other act. It's not the murder. This occurred seven months later. It's not inextricably intertwined with the murder. It's an other act.   I know I'm over on the Garrity issue. The reason why we have this court is that this court is the only case in which we have a case in which this court has adopted an objective test is because when there is a manual, a published manual, there is an inference. It is implicit that the employee has been advised of the manual. We're not going to have separate trials on who read what portion of the manual. How long ago did they read it? What exactly did they remember? It's an objective test because there is an objective inference that that employee knows that he is subject to penalty. To think that Mr. Wells didn't know and all these other employees, I don't know how many of them there were, a dozen, two dozen, they're detained until 930. They are under orders to cooperate and they know they have to cooperate and if they don't, they're going to be subject to penalties. That's what it means to work in the Coast Guard. It was obvious or else they all would have left. When it was time for their shift to be over at 3 p.m., they would have said okay, bye, but instead they had to stay there six and a half hours later because they were under an order to cooperate and he had been specifically told if you don't follow your orders, you could be out of here. It's not just with the charge card. A few weeks earlier, any disobedience, you're subject to potential removal and termination. So he knew he had to cooperate. Counsel, thank you. We thank both the government and Mr. Wells' counsel for their argument and briefing in this case and this case will be submitted and with that we will be in recess for the day. All rise.
judges: HURWITZ, BRESS, THOMAS